In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 20-3478

CITY OF FISHERS, INDIANA, *et al.*,

*Plaintiffs-Appellees*,

*v.*

DIRECTV, *et al.*,

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cv-02351 — **Jane Magnus-Stinson**, *Judge*.

———————————

ARGUED APRIL 21, 2021 — DECIDED JULY 21, 2021

———————————

Before FLAUM, BRENNAN, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. In the lawsuit underlying this appeal, a group of Indiana cities seeks a declaration that Netflix and other video streaming platforms owe them past and future franchise fees under an Indiana statute. The cities filed the action in state court, but the defendant streaming platforms removed the case to federal court. Relying on the doctrine of comity abstention, the district court declined to exercise federal jurisdiction and remanded the case. At this early

stage, the only question before us is whether the district court properly abstained under the teachings of *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010), and like cases. We conclude that it did and therefore affirm.

**I**

The Indiana Video Service Franchises Act of 2006 regulates the way cable television companies do business within the Hoosier state. See Ind. Code § 8-1-34. By the Act's terms, anyone offering "video service" must enter into a franchise agreement with the Indiana Utility Regulatory Commission in exchange for use of a public right-of-way. *Id.* § 8-1-34-16(a), (b). For years, traditional cable and communications companies like Comcast and AT&T have signed the franchise agreements and paid the required fees.

The direct beneficiaries of this arrangement are local governments. Video service providers must pay quarterly franchise fees to government "units," including counties, municipalities, or townships within the provider's service area. *Id.* §§ 8-1-34-24(a), 36-1-2-23. Indiana law requires that the Commission survey the participating units on an annual basis about revenue from the franchise agreements. See *id.* § 8-1-34-24.5(b). According to the Commission's most recent annual report, the units that responded to the survey earned franchise fees totaling $19.4 million in 2019. The Commission also reported that most units deposit the franchise fees into general operating accounts, to be spent on public safety, road maintenance, infrastructure, and the like.

Although enacted in 2006, the Act is arguably behind the times. Most people do not consume media today in the same way they did 15 years ago. Traditional cable television, for

example, has been supplanted in many ways by on-demand streaming platforms like Netflix or Hulu. This modernization has left municipalities questioning whether streaming platforms, too, should be paying a fair share of franchise fees before enjoying the financial benefit of Hoosiers' business. Many cities seem to have concluded that these streaming platforms offer "video service" within the meaning of the Act and should have applied for franchise agreements with the Commission some time ago. To date, though, the streaming platforms have not applied for franchise agreements, and thus have avoided the Act's fee obligations.

In August 2020, the cities of Fishers, Indianapolis, Evansville, and Valparaiso challenged that status quo by filing a putative class action lawsuit in Marion Superior Court against Netflix, Disney, Hulu, DIRECTV, and DISH Network. The cities sought a declaration that the streaming platforms provide "video service" as defined by the Act and therefore must pay past and future franchise fees. For their part, the defendant streaming platforms responded by removing the case to federal court under 28 U.S.C. §§ 1441 and 1453. The platforms explained that the district court had jurisdiction over the lawsuit under both the traditional diversity jurisdiction statute, see 28 U.S.C. § 1332(a), and under the Class Action Fairness Act of 2005, see 28 U.S.C. § 1332(d).

The cities did not dispute the district court's subject matter jurisdiction over the case, but instead filed a motion to remand to state court on abstention grounds. Invoking the comity abstention doctrine articulated most recently in *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010), the cities argued that federal courts have long declined to exercise jurisdiction over cases involving local revenue collection and taxation.

The district court, the cities pressed, should chart that same course here and return the case to Indiana state court.

The district court agreed with the cities and remanded, relying on the *Levin* comity abstention doctrine. The streaming services now appeal from that determination.

## II

We begin with appellate jurisdiction. "An order remanding a case to state court is a final order that is reviewable on appeal unless there is some other prohibition on review." *Hammer v. United States Dep't of Health & Human Servs.*, 905 F.3d 517, 525 (7th Cir. 2018). That prohibition is ordinarily found in 28 U.S.C. § 1447(d), which states that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." But that is not the case here. In *Quackenbush v. Allstate Insurance Co.*, the Supreme Court clarified that § 1447(d) does not bar appellate jurisdiction over abstention-based remand orders and held that such orders are appealable under 28 U.S.C. § 1291. See 517 U.S. 706, 715 (1996).

With confidence in our own appellate jurisdiction to consider the propriety of the district court's abstention-based remand order, we proceed to the merits.

### A

Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). That duty reflects the "undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,

491 U.S. 350, 359 (1989). Because a decision to abstain pushes against this obligation, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River*, 424 U.S. at 813.

Within the tax and revenue world, a federal court's obligation to stay its hand comes most often from the Tax Injunction Act. Enacted in 1867, the TIA provides that a district court "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. In practice, then, the TIA ensures that challenges to state taxes are litigated, if at all, in the state courts. It does not, however, bar federal adjudication of collection suits initiated by states or municipalities. See *Jefferson County v. Acker*, 527 U.S. 423, 433–34 (1999) ("[A] suit to collect a tax is surely not brought to restrain state action, and therefore does not fit the Act's description."). Because the cities initiated this collection suit, all agree that the TIA does not defeat federal jurisdiction.

But our overview of the law in this area does not end there. Alongside the TIA sits a judicially created and related doctrine: comity abstention. "[T]he comity doctrine is more embracive than the TIA," and "counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction." *Levin*, 560 U.S. at 421, 424. That class of cases includes those presenting challenges to "state taxation of commercial activity," on the understanding that revenue collection is a core function of state governments. *Id.* at 421.

Because the comity abstention doctrine often overlaps with the limitations imposed by the TIA, the doctrine is seldom invoked. Leading treatises and casebooks on the law of

federal jurisdiction devote little attention to the doctrine. Yet comity-based abstention enjoys deep roots in the Supreme Court's jurisprudence. In 1870, for instance, the Court underscored that "[i]t is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible." *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 110 (1870). In the early twentieth century, the Court again observed "that a proper reluctance to interfere by prevention with the fiscal operations of the state governments has caused [us] to refrain from so doing in all cases where the Federal rights of the persons could otherwise be preserved unimpaired." *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 282 (1909).

The hesitance to interfere with state and municipal fiscal matters animates more recent Supreme Court decisions as well. See, *e.g.*, *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 (1981) (holding that "taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts").

Many lower courts viewed one Supreme Court case, *Hibbs v. Wynn*, as breaking from that tradition. See 542 U.S. 88 (2004). In *Hibbs*, the Court stated that comity principles "preclude original federal-court jurisdiction *only when* plaintiffs have sought district-court aid in order to arrest or countermand state tax collection." *Id.* at 107 n.9 (2004) (emphasis added). In plainer terms, the comity doctrine—according to *Hibbs*—imagines the plaintiff as a disgruntled taxpayer trying to cut down his own tax burden. The flip side of the coin

seemed to be that the doctrine does *not* prevent federal adjudication of controversies regarding state revenue collection brought by other types of plaintiffs, including government units or third parties. After *Hibbs*, then, several courts of appeals—including our court—understood the Supreme Court to have narrowed the comity doctrine's reach. See, *e.g.*, *Levy v. Pappas*, 510 F.3d 755 (7th Cir. 2007); *Wilbur v. Locke*, 423 F.3d 1101 (9th Cir. 2005).

In *Levin*, however, the Court rejected that interpretation of *Hibbs* and reinforced the comity doctrine's broad foundation. The dispute in *Levin* stemmed from an Ohio tax exemption for local energy distribution companies. See 560 U.S. at 418. A California energy company sought to improve its own competitive position in Ohio in part by filing a federal complaint asking the district court to declare the local tax benefit unconstitutional. See *id.* at 419. The district court declined to exercise jurisdiction over the California corporation's claims as a matter of comity. *Id.* at 419–20. But the Sixth Circuit reversed. Relying on *Hibbs*, the court observed that the *Levin* plaintiff did not seek the aid of the district court to halt collection of a state tax. To the contrary, the California energy company, acting as a third party, sought to prevent a different entity from enjoying a tax break. This distinction made all the difference to the Sixth Circuit, which then rejected the district court's "expansive reading of [the Supreme Court's] comity precedents." *Id.* at 420 (quotation marks omitted).

The Supreme Court reversed, reiterated the value and breadth of the comity doctrine, and remanded the case for dismissal. "The comity doctrine," the Court emphasized, reflects "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state

governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways." *Id.* at 421 (quoting *Fair Assessment*, 454 U.S. at 112). These comity principles, the Court continued, have "particular force when lower federal courts are asked to pass on the constitutionality of state taxation of commercial activity." *Id.*

The Court then went further and explained that a "confluence of factors" supported abstention in *Levin*:

- *First*, "respondents seek federal-court review of commercial matters over which [the state] enjoys wide regulatory latitude; their suit does not involve any fundamental right or classification that attracts heightened judicial scrutiny."

- *Second*, "while respondents portray themselves as third-party challengers to an allegedly unconstitutional tax scheme, they are in fact seeking federal-court aid in an endeavor to improve their competitive position."

- *Third*, "[state] courts are better positioned than their federal counterparts to correct any violation because they are more familiar with state legislative preferences and because the [Tax Injunction Act] does not constrain their remedial options."

*Id.* at 431–32.

*Levin*—and the history of comity abstention more broadly—delivered a clear message that federal courts should think twice before taking too couched a view of the comity abstention doctrine. See, *e.g.*, *Joseph v. Hyman*, 659 F.3d 215, 218 (2d Cir. 2011) (observing that "[i]n *Levin*, the Court

abrogated the post-*Hibbs* cases that had crimped the comity doctrine and held that comity is 'more embracive' than the TIA").

B

The parties dispute the threshold question whether this case qualifies for a *Levin*-based comity abstention analysis. Determining whether an abstention doctrine applies in the first instance is a question of law that we review *de novo*. See *R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 714 (7th Cir. 2009). Our analysis requires considering at least two factual differences between this dispute and the one at issue in *Levin*.

First, the state law in question here, the Indiana Video Service Franchises Act, does not impose a direct tax. The Act instead allows local governments to levy franchise fees upon video service providers conducting business within the state. But we can dispatch this distinction without much difficulty, as the defendant streaming platforms conceded at oral argument that the fee here—which is most often deposited in the government units' general accounts—can be understood as a tax for *Levin* purposes. This concession was in no way surprising, as the franchise fee imposed under the Act, much like a tax, yields revenue for municipalities in Indiana. See *DIRECTV, Inc. v. Tolson*, 513 F.3d 119, 125 (4th Cir. 2008) ("Because the principle of comity reflects the recognition that states should be free from federal interference in the administration of their fiscal operations, we interpret the term 'tax' broadly for purposes of our jurisdictional inquiry."); see also *Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 800 (4th Cir. 1997) (observing that "the line between 'tax' and 'fee' can be a blurry one," but adding that "[i]f the revenue is paid into the state's (or county's) general fund and provides a general

benefit to the public, it sounds like a tax"). The comity doctrine is implicated by the cities' demand for fees in this case.

Second, remember that unlike in *Levin*, where an aggrieved third-party taxpayer sought to chip away at another entity's tax benefit, the cities themselves initiated this collection lawsuit. But this distinction, too, is of little moment. Regardless of who brought the underlying suit, the district court's resolution of the merits issues will risk or result in federal court interference with the fiscal affairs of local government—the principal concern of *Levin*. See *Levin*, 560 U.S. at 422. Indeed, the district court's involvement will impact the cities' ability to generate revenue, either by permitting the collection of franchise fees or by cutting off a line of potential income. We are not convinced that the cities' role as plaintiffs in this lawsuit makes any difference to the *Levin* abstention calculus. See *id.* ("[A] proper reluctance to interfere by injunction with [a state's] fiscal operations[ ] require[s] that such relief should be denied *in every case* where the asserted federal right may be preserved without it." (quoting *Matthews v. Rodgers*, 284 U.S. 521, 525 (1932) (emphasis added))).

On balance, we conclude that the comity doctrine has something to say about the propriety of a federal court adjudicating this dispute, and the district court did not err by applying the *Levin* abstention factors.

C

Confident that this case calls for a *Levin* abstention analysis, the question becomes whether the district court abused its discretion by concluding that the factors identified in *Levin* support abstention here. See *Hammer*, 905 F.3d at 530. It did not.

Recall the *Levin* factors: whether the subject of an action is one over which a state enjoys "wide regulatory latitude," whether a party is seeking federal aid to improve their competitive position, and whether a state court is better positioned to resolve the dispute due to familiarity with "state legislative preferences" and because the TIA poses no constraints. 560 U.S. at 431–32.

The district court considered these factors with care, reasoning that:

- *First*, the streaming companies "seek federal-court intervention over matters over which the State of Indiana and its municipalities have traditionally 'enjoyed wide regulatory latitude'—specifically, utility regulation and state revenue."

- *Second*, the streaming companies "invoke the Court's jurisdiction 'to improve their competitive position,' namely over traditional cable television and landline telephone providers that pay franchise fees under the VSF Act."

- *Third*, "this matter involves interpretation of Indiana state law—specifically, certain provisions of the VSF Act—for which this Court could identify no precedent from any Indiana court." The district court also added that "Indiana state courts are better positioned than the Court to correct any potential constitutional or other violation [the streaming services] may raise because 'they are more familiar with state legislative preference' concerning the VSF Act and because the TIA constrains remedial options available to the Court."

We agree that each factor weighs in favor of abstention. On the first, the State of Indiana and its municipal governments exercise broad authority over utility and right-of-way regulation within the State. The Indiana General Assembly, by enacting the Indiana Video Service Franchises Act, designed an administrative scheme under which the Indiana Utility Regulatory Commission has sole licensing and franchise authority over video services—franchise authority that, in the end, benefits local governments. See Ind. Code § 8-1-34-16(a), (b). By asking a federal court to interpret the Act, the streaming platforms seek to inject a federal court into matters affecting local revenue over which the State of Indiana and its municipalities enjoy wide regulatory latitude.

On the second, we agree with the district court's observation that the streaming platforms removed the case and oppose the cities' demand for fees as part of an attempt to maintain a competitive advantage over traditional cable providers. See *Levin*, 560 U.S. at 431 (reasoning that the plaintiff sued "in an endeavor to improve their competitive position"). If streaming platforms, like cable companies, are compelled to pay franchise fees under the Act, that requirement will reduce profits and, in turn, may affect the price of video streaming services to consumers.

As for the third, Indiana courts are well positioned to address remedial questions that might arise in the context of adjudicating both the cities' state law claims and the streaming platforms' defenses, including those defenses rooted in federal law. The federal defenses—all of which the streaming platforms invoke to avoid paying the franchise fees called for by the Act—are not hypothetical. To date, the streaming platforms have raised the following arguments in state court:

- Federal law preempts state and local attempts to impose franchise fees on the streaming platforms;

- The federal Internet Tax Freedom Act prohibits discriminatory treatment of e-commerce;

- The Indiana Video Service Franchises Act violates the First Amendment to the United States Constitution;

- The state court should defer to the Indiana Utility Regulatory Commission under the primary jurisdiction doctrine.

*Levin* and the Tax Injunction Act counsel that state court is the appropriate forum for review of federal challenges to state taxes. See *id.* at 429 (explaining that "if the Ohio scheme is indeed unconstitutional, surely the Ohio courts are better positioned to determine—unless and until the Ohio legislature weighs in—how to comply with the mandate of equal treatment").

Likewise here. The Indiana courts are well positioned to interpret (for the first time) the state's Video Service Franchises Act and, in turn, to resolve any federal defenses raised by the streaming platforms along the way. See *Burt v. Titlow*, 571 U.S. 12, 19 (2013) (highlighting "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights"). Because we agree with the district court that all signs point to the need for comity-based abstention, we find no abuse of discretion in that determination.

## III

The streaming platforms advance several counterpoints opposing abstention. But none strikes us as persuasive, and,

in any event, the companies failed to preserve these argu-
ments in the district court.

The platforms' primary contention on appeal is that the
Class Action Fairness Act of 2005 had the effect of eliminating
federal courts' ability to apply preexisting abstention doc-
trines to class actions otherwise authorized for removal under
the statute. This position has some surface appeal. After all,
CAFA created "original jurisdiction over cases that previ-
ously were beyond federal diversity subject-matter jurisdic-
tion," and expanded "the universe of cases that may be re-
moved pursuant to the general removal statute." Charles
Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 3724 (4th ed. 2021). Mindful of this expansion, Congress also
took care in CAFA to limit the reach of federal jurisdiction to
class actions with meaningful interstate ramifications. In two
express exceptions—the local-controversy exception and the
home-state exception—Congress refused to extend federal ju-
risdiction over class actions rooted in a single state. See
28 U.S.C. § 1332(d)(4)(A)–(B). Congress's inclusion of these
express exceptions, without any reference to more general
comity or federalism concerns, the streaming platforms con-
tend, effectively eliminates a federal court's authority to re-
mand putative class actions on non-statutory grounds.

The streaming platforms seek to bolster their position by
directing us to the Supreme Court's 1976 decision in
*Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336. In
*Thermtron*, the Court concluded that a district court exceeded
its authority when it remanded a properly removed case to
state court on the basis of an overcrowded docket—a ground
not permitted by the applicable federal removal statute,
28 U.S.C. § 1447(c). See *id.* at 345. The Court's reasoning was

plain: "[C]ases properly removed from state to federal court within the federal court's jurisdiction may not be remanded for discretionary reasons not authorized by the controlling statute." *Id.* at 345 n.9. Seizing upon this language, the streaming platforms posit that CAFA provides an exhaustive list of exceptions under which a federal court may decline the exercise of jurisdiction.

We doubt it. For starters, the Supreme Court has limited *Thermtron*'s holding in more recent years. In *Carnegie-Mellon University v. Cohill*, the Court rejected the argument that because "the removal statute explicitly authorizes remands in two situations," Congress must have "intended to preclude district courts from remanding" on any other ground. 484 U.S. 343, 353 (1988). Such an interpretation, the Court reasoned, "is based not on the language of Congress, but on its silence." *Id.* We think the same interpretive flaw undermines, if not defeats, the streaming platforms' argument here. The fact that Congress considered federal-state comity in the CAFA exceptions does not mean that it swept decades of abstention doctrines off the table.

Even more, abstention doctrines reflect foundational features of our federal constitutional system, including respect for dual sovereignty and caution against interfering with traditional state functions, like taxation. See *Levin*, 560 U.S. at 421. To be sure, CAFA's express exceptions reflect Congress's judgment that it would be unwise to reroute a class action with deep roots in a single state to federal court. But those exceptions complement—and do not displace—preexisting comity concerns. See *id.* We are unwilling to say that CAFA eliminates a federal court's ability, if not obligation, to consider the comity abstention principles at the heart of *Levin* and

like cases. As we recently observed, "the Supreme Court has repeatedly cautioned that statutes conferring federal jurisdiction . . . should be read with sensitivity to federal-state relations and wise judicial administration. CAFA is such a jurisdictional statute." *Saskatchewan Mut. Ins. Co. v. CE Design, Ltd.*, 865 F.3d 537, 542 (7th Cir. 2017) (cleaned up).

But we can stop short of reaching any definitive conclusion, for the streaming platforms' CAFA-based argument faces an insurmountable and independent hurdle—waiver. "It is a well-established rule that arguments not raised to the district court are waived on appeal." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). The streaming platforms' CAFA argument falls squarely within that rule and falls out of this appeal. The platforms failed to cite *Thermtron* in their district court filings. And they never argued that federal courts lack authority under CAFA to remand properly removed cases on non-statutory grounds. We will not reverse the district court's determination on a ground not presented to it. See *Duncan Place Owners Assoc. v. Danze, Inc.*, 927 F.3d 970, 974 (7th Cir. 2019).

Waiver problems also plague the streaming platforms' remaining arguments in opposition to abstention. For the first time on appeal, the platforms posit that *Levin* comity requires the existence of a pending state proceeding. That seems far from certain. Indeed, nowhere in the *Levin* "confluence of factors" did the Supreme Court condition comity abstention on the presence of pending state proceedings. See 560 U.S. at 431–32.

The streaming platforms' final argument fares no better. On appeal, the streaming platforms invoke *Quackenbush* for the proposition that "federal courts have the power to dismiss

or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." 517 U.S. at 731. But, again, they failed to present this argument to the district court, so it is waived.

Even so, we are far from persuaded that *Quackenbush* should be read as broadly as the streaming platforms suggest. The Supreme Court has permitted abstention in at least one case involving a request for declaratory relief tied to a damages action. See *Fair Assessment*, 454 U.S. at 111 (concluding that abstention was appropriate in a § 1983 damages action where the availability of damages turned on initial declaratory relief). *Quackenbush* itself acknowledged and distinguished *Fair Assessment* because "[t]he damages action in [*Fair Assessment*] was based on the unconstitutional application of a state tax law, and the award of damages turned first on a declaration that the state tax was in fact constitutional." *Quackenbush*, 517 U.S. at 719. That logic tracks in this statutory context too: any damages award will depend on the district court first determining that the streaming platforms are subject to the Indiana Video Service Franchises Act. In this case, though, we need not plant our feet firmly on either side of this debate. The streaming platforms' failure to raise the issue with the district court dooms any chance of success on appeal.

All told, we have heard no argument—preserved or otherwise—that convinces us to depart from our earlier conclusions. *Levin* comity applies to this dispute and the district court did not abuse its discretion by returning the case to state court.

## IV

In closing, we reiterate that federal courts are duty-bound to exercise the jurisdiction granted by Congress. See *Colo. River*, 424 U.S. at 817. But we must remember, too, that the Supreme Court placed the comity abstention doctrine—first recognized more than a century ago—on a firm foundation in *Levin*. By clarifying that *Hibbs v. Wynn* "has a more modest reach," the Court reaffirmed that federal courts should exercise substantial caution before adjudicating disputes with meaningful impacts on matters of state taxation and revenue collection. *Levin*, 560 U.S. at 424; see also *Fair Assessment*, 454 U.S. at 111; *Boise Artesian Hot & Cold Water Co.*, 213 U.S. at 282.

The Supreme Court is sure to say more about the limits of comity abstention in years to come. Today, though, informed in part by substantial issues of waiver, we are satisfied that the district court did not abuse its discretion by granting the cities' motion to remand to Indiana state court.

We therefore AFFIRM.